UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

'09 CIV 3949

---

——————————————————————— x

ALFRED FAIT, on Behalf of Himself and All
Others Similarly Situated,

               Plaintiff,

   vs.

BARCLAYS BANK PLC, BARCLAYS PLC,
JOHN SILVESTER VARLEY, ROBERT
EDWARD DIAMOND, JR., SIR RICHARD
BROADBENT, RICHARD LEIGH
CLIFFORD, DAME SANDRA J.N.
DAWSON, SIR ANDREW LIKIERMAN, SIR
NIGEL RUDD, STEPHEN GEORGE
RUSSELL, JOHN MICHAEL
SUNDERLAND, MATTHEW WILLIAM
BARRETT, NAGUIB KHERAJ, MARCUS
AGIUS, CHRISTOPHER LUCAS, GARY A.
HOFFMAN, FREDERIK SEEGERS, DAVID
G. BOOTH, FULVIO CONTI, DANIEL
CRONJE, BARCLAYS CAPITAL
SECURITIES LIMITED, CITIGROUP
GLOBAL MARKETS INC., WACHOVIA
CAPITAL MARKETS, LLC, MORGAN
STANLEY & CO. INCORPORATED, UBS
SECURITIES LLC, BANC OF AMERICA
SECURITIES LLC, RBC DAIN RAUSCHER
INC., A.G. EDWARDS & SONS, INC.,
MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED, BNP PARIBAS
SECURITIES CORP., GOLDMAN, SACHS
& CO., KEYBANC CAPITAL MARKETS,
SUNTRUST CAPITAL MARKETS, INC.,
WELLS FARGO SECURITIES LLC and
PRICEWATERHOUSECOOPERS LLP,

               Defendants.

——————————————————————— x

Civil Action No.

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS



U.S. DISTRICT COURT
FILED
APR 2 0 2009
S. D. OF N.Y.

RECEIVED
09 APR 20 PM 8:23
U.S. DISTRICT COURT
S.D.N.Y.

<u>DEMAND FOR JURY TRIAL</u>

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who acquired preferred securities pursuant or traceable to the materially false and misleading registration statements filed with the United States Securities and Exchange Commission ("SEC") by Barclays Bank Plc ("Barclays Bank") on September 14, 2005 ("2005 Registration Statement") and August 31, 2007 ("2007 Registration Statement") (collectively, the "Registration Statements").[1]  This action asserts strict liability claims under the Securities Act of 1933 ("1933 Act") against Barclays Bank, Barclays Plc, its senior insiders, the investment banks that underwrote the offerings of the Securities, and Barclays Bank's auditor (collectively, "defendants").

2.     Barclays Bank is a major global financial services provider engaged in retail and commercial banking, credit cards, investment banking, wealth management and investment management services.  Barclays Bank's United States operations are headquartered in New York, New York, and it has offices around the globe.

3.     From April of 2006 through April of 2008, Barclays Bank consummated offerings of the Securities pursuant to the false and misleading Registration Statements (the "Offerings"), selling 218 million shares of the Securities at $25 per share for proceeds of $5.45 billion.

4.     Barclays Bank ultimately announced huge multi-billion dollar impairment charges associated with its exposure to mortgage-related securities, causing the prices of the Securities to decline.

5.     The true facts which were omitted from the Registration Statements were:

---

[1]     The securities at issue (collectively, the "Securities") are Non-cumulative Callable Dollar Preference Shares, Series 2, 3, 4 and 5, sold in the form of American Depository Shares ("ADRs") of Barclays Bank.

(a)     Barclays' portfolio of mortgage-related securities was impaired to a much larger extent than had been disclosed;

(b)     Defendants failed to properly record losses for impaired assets;

(c)     Barclays' internal controls were inadequate to prevent the Company from improperly reporting its mortgage-related investments; and

(d)     Barclays was not as well capitalized as represented and would have to continually raise additional capital, which would dilute current holders and those investors purchasing the Securities in the Offerings.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the 1933 Act [15 U.S.C. §§77k, 77l(a)(2) and 77o]. In connection with the acts complained of, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

8.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the underwriter defendants conduct business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

9.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

10.     Plaintiff Alfred Fait acquired securities pursuant or traceable to the Registration Statements as set forth in the attached certification and has been damaged thereby.

11.     Defendant Barclays Bank is a major global financial services provider operating in Europe, North America, the Middle East, Latin America, Australia, Asia and Africa.  Barclays Bank's United States operations are headquartered in New York, New York.

12.     Defendant Barclays Plc ("Barclays") is a holding company that is listed in London, New York and Tokyo and operates through its subsidiary Barclays Bank and acts as the ultimate holding company.  Barclays is located in London, England.

13.     Defendant John Silvester Varley ("Varley") is, and at all relevant times was, Chief Executive Officer ("CEO") and a director of Barclays Bank and Barclays.  Varley signed the false and misleading Registration Statements.

14.     Defendant Robert Edward Diamond, Jr. ("Diamond") is, and at all relevant times was, a director and President of Barclays Bank and Barclays.  Diamond signed the false and misleading Registration Statements.

15.     Defendant Sir Richard Broadbent ("Broadbent") is, and at all relevant times was, a director of Barclays Bank and Barclays.  Defendant Broadbent signed the false and misleading Registration Statements.

16.     Defendant Richard Leigh Clifford ("Clifford") is, and at all relevant times was, a director of Barclays Bank and Barclays.  Defendant Clifford signed the false and misleading Registration Statements.

17.     Defendant Dame Sandra J.N. Dawson ("Dawson") is, and at all relevant times was, a director of Barclays Bank and Barclays.  Defendant Dawson signed the false and misleading Registration Statements.

18. Defendant Sir Andrew Likierman ("Likierman") is, and at all relevant times was, a director of Barclays Bank and Barclays. Defendant Likierman signed the false and misleading Registration Statements.

19. Defendant Sir Nigel Rudd ("Rudd") is, and at all relevant times was, a director of Barclays Bank and Barclays. Defendant Rudd signed the false and misleading Registration Statements.

20. Defendant Stephen George Russell ("Russell") is, and at all relevant times was, a director and Secretary of Barclays Bank and Barclays. Defendant Russell signed the false and misleading Registration Statements.

21. Defendant John Michael Sunderland ("Sunderland") is, and at all relevant times was, a director of Barclays Bank and Barclays. Defendant Sunderland signed the false and misleading Registration Statements.

22. Defendant Matthew William Barrett ("Barrett") was Chairman of the Board of Barclays Bank and Barclays until he resigned from the Company on January 1, 2007. Barrett signed the false and misleading 2005 Registration Statement.

23. Defendant Naguib Kheraj ("Kheraj") was Principal Financial Officer and a director of Barclays Bank and Barclays until he resigned from the Company on March 31, 2007. Defendant Kheraj signed the false and misleading 2005 Registration Statement.

24. Defendant Marcus Agius ("Agius") is Group Chairman of Barclays Bank and Barclays. Agius signed the false and misleading 2007 Registration Statement.

25. Defendant Christopher Lucas ("Lucas") is a director of Barclays Bank and Barclays. Lucas signed the false and misleading 2007 Registration Statement.

26.     Defendant Gary A. Hoffman ("Hoffman") is a director of Barclays Bank and Barclays.  Hoffman signed the false and misleading 2007 Registration Statement.

27.     Defendant Frederik Seegers ("Seegers") is a director of Barclays Bank and Barclays.  Seegers signed the false and misleading 2007 Registration Statement.

28.     Defendant David G. Booth ("Booth") is a director of Barclays Bank and Barclays.  Booth signed the false and misleading 2007 Registration Statement.

29.     Defendant Fulvio Conti ("Conti") is a director of Barclays Bank and Barclays.  Conti signed the false and misleading 2007 Registration Statement.

30.     Defendant Daniel Cronje ("Cronje") is a director of Barclays Bank and Barclays.  Cronje signed the false and misleading 2007 Registration Statement.

31.     The defendants referenced above in ¶¶13-30 are referred to herein as the "Individual Defendants."

32.     Defendant Barclays Capital Securities Limited ("Barclays Securities") is the investment banking division of Barclays Capital.  Barclays Securities was an underwriter of the Offerings.

33.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a large integrated financial services institution that through subsidiaries and divisions provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities.  Citigroup was an underwriter of the Offerings.

34.     Defendant Wachovia Capital Markets, LLC ("Wachovia Capital")  is the corporate and investment banking side of brokerage firm Wachovia Securities (both companies are subsidiaries of banking giant Wachovia).  Wachovia Capital provides financial and corporate advisory services, private capital, debt private placement, mergers and acquisitions advice,

underwriting, and equity investing. It also offers real estate financing, risk management services, and structured products such as asset-backed and mortgage-backed securities. Wachovia Capital was an underwriter of the Offerings.

35. Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to customers, including corporations, governments, financial institutions and individuals. Morgan Stanley assists public and private corporations in raising funds in the capital markets (both equity and debt), as well as in providing strategic advisory services for mergers, acquisitions and other types of financial transactions. Morgan Stanley was an underwriter of the Offerings.

36. Defendant UBS Securities LLC ("UBS") is the U.S. investment banking and securities arm of UBS Investment Bank. UBS Investment Bank provides a range of financial products and services worldwide. UBS was an underwriter of the Offerings.

37. Defendant Banc of America Securities LLC ("Banc of America") is the investment banking arm of Bank of America. Banc of America offers trading and brokerage services; debt and securities underwriting; debt and equity research; and advice on public offerings, leveraged buyouts, and mergers and acquisitions. Banc of America was an underwriter of the Offerings.

38. Defendant RBC Dain Rauscher Inc. ("RBC") was the corporate and investment banking division of Royal Bank of Canada (the "Bank"). In March 2008, RBC Dain Rauscher Inc. changed its name to RBC Wealth Management ("RBC Wealth"). RBC Wealth is a division of RBC Capital Markets Corporation, which is a wholly-owned subsidiary of the Bank. RBC was an underwriter of the Offerings.

39.     Defendant A.G. Edwards & Sons, Inc. ("A.G. Edwards") is a full-service investment brokerage subsidiary of Wachovia Securities, which was acquired by Wells Fargo & Company. A.G. Edwards was an underwriter of the April 2006 and September 2007 offerings.

40.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") provides capital markets services, investment banking and advisory services, wealth management, asset management, insurance, banking and related products and services on a global basis. Merrill Lynch was an underwriter of the April 2006, December 2007 and April 2008 offerings.

41.     Defendant BNP Paribas Securities Corp. ("BNP") is the largest bank in Europe and is active in the finance, investment and asset management markets. BNP was an underwriter of the April 2006 offering.

42.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a leading global investment banking, securities and investment management firm that provides a wide range of services worldwide to a substantial and diversified client base that includes corporations, financial institutions, governments and high-net-worth individuals. Goldman Sachs was an underwriter of the April 2006 offering.

43.     Defendant KeyBanc Capital Markets ("KeyBanc") is a boutique investment bank that provides financial advisory services. KeyBanc offers mergers and acquisitions advisory, divestitures, initial public offering, capital restructuring, equity and debt financing, and corporate loan syndication consulting services and provides securities underwriting, interest rate risk management, equity research and treasury management solutions. Additionally, KeyBanc offers brokerage, equity trading, and investment advisory services. KeyBanc was an underwriter of the April 2006 offering.

44.     Defendant SunTrust Capital Markets, Inc. ("SunTrust") is a full-service investment bank that specializes in emerging growth companies in selected industries.  SunTrust was an underwriter of the April 2006 offering.

45.     Defendant Wells Fargo Securities LLC ("Wells Fargo") provides investment banking services in the United States.  Wells Fargo offers capital markets access through public offerings, private placements, and debt offerings, which include new issue underwriting of high yield bonds and private placements, as well as market making, research, and equity trading.  Wells Fargo also provides advisory services for mergers and acquisitions.  Wells Fargo was an underwriter of the April 2006 offering.

46.     Pursuant to the 1933 Act, the defendants referenced in ¶¶32-45 above are referred to herein as the "Underwriter Defendants."

47.     The Underwriter Defendants are *liable* for the false and misleading statements in the Registration Statements.  In connection with the Offerings, the Underwriter Defendants drafted and disseminated the Registration Statements and were paid fees in connection therewith.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

48.     Defendant PricewaterhouseCoopers LLP ("PwC") is an audit, tax and advisory firm that served as Barclays' auditor during the relevant period and, with its consent, was named as having certified a portion of the Registration Statements, as well as the financial results presented in Barclays' 2005, 2006 and 2007 Forms 20-F.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired the Securities pursuant or traceable to the Company's false and misleading Registration Statements

issued in connection with the Company's Offerings and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is impracticable.  The Securities were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Barclays Bank or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether the 1933 Act was violated by defendants' acts as alleged herein; whether statements made by defendants to the investing public in the Registration Statements misrepresented material facts about the business, operations and management of Barclays Bank; and to what extent the members of the Class have sustained damages and the proper measure of damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

55.     Barclays is a major global financial services provider engaged in retail and commercial banking, credit cards, investment banking, wealth management and investment management services, with an extensive international presence in Europe, the USA, Africa and Asia. Barclays is the parent of Barclays Bank, which is a major global financial services provider engaged in retail and commercial banking, credit cards, investment banking, wealth management and investment management services. It is one of the largest financial services companies in the world by market capitalization.

## THE FALSE AND DEFECTIVE REGISTRATION STATEMENTS
## AND PROSPECTUSES

56.     On or about September 14, 2005, Barclays Bank filed with the SEC the 2005 Registration Statement using a "shelf" registration statement or offering process.  Pursuant to that process, the 2005 Registration Statement permitted Barclays Bank to sell securities in several offerings going forward after a prospectus supplement to the 2005 Registration Statement was filed for each offering.  The 2005 Registration Statement incorporated certain SEC filings:

INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The SEC allows us to "incorporate by reference" the information we file with them, which means we can disclose important information to you by referring you to those documents. The most recent information that we file with the Securities and Exchange Commission automatically updates and supersedes earlier information.

We filed our annual report on Form 20-F for the fiscal year ended December 31, 2004 (the "2004 Form 20-F") with the SEC on March 24, 2005 and an amendment thereto on May 6, 2005. We have also filed extracts from a results announcement by Barclays PLC for the six months ended June 30, 2005 under cover of Form 6-K with the SEC on August 12, 2005. We are incorporating the 2004 Form 20-F, as amended, and the Form 6-K dated August 12, 2005 by reference into this prospectus.

In addition, we will incorporate by reference into this prospectus all documents that we file with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") and, to the extent, if any, we designate therein, reports on Form 6-K we furnish to the SEC after the date of this prospectus and prior to the termination of any offering contemplated in this prospectus.

57.     The 2005 Registration Statement also incorporated by reference subsequently filed prospectuses:

That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

58.     The 2005 Registration Statement also included assurances that the Registrant would undertake

[t]o reflect in the document any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement . . . .

59.     The 2005 Registration Statement also stated:

EXPERTS

PricewaterhouseCoopers LLP, Chartered Accountants and Registered Auditors, have audited our consolidated financial statements included in the 2004 Form 20-F, as amended, and incorporated by reference in this document and the Registration Statement. We have incorporated the consolidated financial statements in reliance on the report of PricewaterhouseCoopers LLP, Chartered Accountants and Registered Auditors, given on the authority of their firm as experts in auditing and accounting.

60.    On March 29, 2006, Barclays Bank filed its Annual Report on Form 20-F for the year 2005 ("2005 20-F") with the SEC.  The 2005 20-F stated:

The Group's profit before tax in 2005 increased 15% (£700m) to £5,280m (2004: £4,580m). Total income net of insurance claims increased 23% (£3,225m) to £17,333m (2004: £14,108m) whilst operating expenses excluding amortisation of intangible assets rose 23% (£1,934m) to £10,448m (2004: £8,514m). Amortisation of intangible assets was £79m (2004: £22m).  Impairment charges and other credit provisions rose 44% to £1,571m (2004: £1,093m).

Earnings per share rose 7% to 54.4p (2004: 51.0p), diluted earnings per share rose 6% to 52.6p (2004: 49.8p). Dividends per share rose 11% to 26.6p (2004: 24.0p). Return on average shareholders' funds was 21% (2004: 22%). Economic profit was up 12%, in line with our expectations and a reflection of tight capital management as well as a good business performance.

Non-performing loans increased £1,095m (27%) to £5,210m. Potential problem loans increased £131m to £929m. Coverage of non-performing loans was broadly steady at 66.2% (2004: 66.9%) while the coverage of potential credit risk loans also remained stable at 56.2% (2004: 56.0%).

Our capital position remained healthy. Shareholders' equity excluding minority interests increased £1,556m (10%) to £17.4bn, primarily due to profit retention. Total assets increased £386bn (80%) to £924bn. Weighted risk assets increased £50bn (23%) to £269bn. The tier 1 capital ratio decreased to 7% (2004: 7.6%) and the risk asset ratio decreased to 11.3% (2004 11.5%).

Business Performance

There was good growth in profit before tax for the Group as a whole with momentum in the core UK businesses and strong growth in our global product businesses. Our Group as a whole, and the businesses within it, are gaining momentum both in terms of balance sheet and assets under management. Overall, our performance in 2005 reflects consistent execution of our strategy, and has strengthened our position for future growth.

**UK Banking** produced good profit growth, up 8%, to £2,455m (2004: £2,265m) and outperformed its productivity target for 2005 with the cost:income ratio improving by three percentage points. In UK Banking our ambition is to build the best bank in the UK – and we are making good progress.

**UK Retail Banking** achieved solid income growth of 4% in 2005. Operating expenses decreased 3% through strong cost control whilst continuing targeted reinvestment to improve customer service and the branch network. Profit before tax grew 7% to £1,027m (2004: £963m). Excluding the gain of £42m on the sale of our stake in Edotech in 2004, underlying profit before tax increased 12%. UK Retail

- 12 -

Banking continued to make good progress on its transformation programme, including launching a new general insurance proposition with Aviva, a new initiative in current accounts and making ongoing investments in branding, branches and customer service.

**UK Business Banking** profit before tax increased 10% to £1,428m (2004: £1,302m), driven by strong income and balance sheet growth. Operating expenses grew slower than income leading to an improved cost:income ratio of 35%. UK Business Banking put in another strong performance based on its business model of relationship management and industry specialisation.

**Barclays Capital** continued its very strong growth of recent years, with profit before tax in 2005 rising 25% to £1,272m (2004: £1,020m). Income growth of 27% was broadly-based across products and geographies. The year also saw continued investment in building Barclays Capital's scale and diversity in terms of geography, products and people. As a result of investment and the profit performance, operating expenses grew 28%. Market risk was well controlled with DVaR falling 6% to £32m as a result of increased diversification. The rate of growth of earnings once again exceeded the rate of growth of capital consumption.

**Barclays Global Investors** achieved outstanding results, with profit before tax rising 61% to £542m (2004: £336m), reflecting strong growth in net new assets and a continuing improvement in operating margins. Income growth of 48% was driven by significant increases in management fees, incentive fees, and securities lending revenues. Operating expenses rose 40%, reflecting higher performance-based compensation and significant investment in the platform and in innovative new products. Barclays Global Investors was one of the leaders in its product markets through operational excellence and a "one firm" approach to meeting client needs.

Profit before tax in **Wealth Management** rose by 56% to £172m (2004: £110m) – a very strong performance driven by broad-based income growth of 11% and improved cost efficiency. Operating expenses grew by only 3% as efficiency savings funded significant cost restructuring and investment programmes. Our stated goal is to position our Wealth Management business as a leading European wealth manager. During 2005 the transformation of the business for future growth began to deliver results.

**Barclaycard** profit before tax fell 19% to £687m (2004: £843m), driven by higher levels of impairment in the UK and continued investment in the International businesses. Income growth of 15% reflected good performances by the UK cards and loans businesses and very strong international growth. Operating expenses rose 21%, reflecting continued heavy investment in the business, particularly internationally. Barclaycard US, previously Juniper, grew strongly in line with plan, and cards in Spain and Germany performed strongly. We now have over 4.3 million international cards in issue.

- 13 -

**International Retail and Commercial Banking** was transformed by the acquisition of Absa. **International Retail and Commercial Bank excluding Absa** increased profit before tax 21% to £355m (2004: £293m). Income growth of 20% reflected strong balance sheet growth in Europe and Africa. Operating expenses grew in line with income as we accelerated the integration of Banco Zaragozano. Excluding integration costs of £57m, Barclays Spain increased profit before tax 25% to £156m (2004: £125m).

We completed the acquisition of a majority stake in Absa Group Limited in July 2005. For the five-month period of Barclays ownership, Absa contributed £335m to profit before tax. The performance of Absa is ahead of the business plan that underpinned the acquisition.

**Head office functions and other operations** loss before tax increased to £532m (2004: £235m). This was driven by accounting adjustments to eliminate inter-segment transactions of £204m (2004: £69m) and non-recurring costs of £165m (2004: £32m) including the costs of Head office relocation and a write-off of capitalised IT-related assets.

61. The 2005 20-F also included the following statement by PwC:

Independent Registered Public Accounting Firm's report

Report of the Independent Registered Public Accounting Firm to the Board of Directors and Shareholders of Barclays PLC and Barclays Bank PLC

We have audited the accompanying consolidated financial statements of Barclays PLC and its subsidiary undertakings on pages 131 to 266 and Barclays Bank PLC and its subsidiary undertakings on pages 271 to 283 as of 31st December 2005 and 2004, which comprise the Consolidated Income Statements, the Consolidated Balance Sheets, the Consolidated Cash Flow Statements, and the Consolidated Statement of Recognised Income and Expense, for each of the two years in the period ended 31st December 2005. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Barclays PLC and its subsidiary undertakings and Barclays Bank PLC and its subsidiary undertakings at 31st December 2005 and 2004, and the results of their operations and their cash flows for each of the two years in the period ended 31st December 2005 in conformity with International Financial Reporting Standards (IFRSs) as adopted by the European Union.

*         *         *

PricewaterhouseCoopers LLP
Chartered Accountants and Registered Auditors
London, United Kingdom

62.    On or about April 21, 2006, Barclays Bank filed, on Form 424B2, the prospectus supplement to the 2005 Registration Statement for the April 2006 offering (the "April 2006 Prospectus"), pursuant to which defendants sold 30 million shares of the Series 2 Securities at $25 per share, for proceeds of over $750 million.  The Prospectus incorporated by reference Barclays Bank's previously filed 2005 Form 20-F.

63.    On March 26, 2007, Barclays filed its 2006 Form 20-F Annual Report ("2006 20-F") with the SEC.  The 2006 20-F stated:

Group financial performance

The Group's profit before tax in 2006 increased 35% (£1,856m) to £7,136m (2005: £5,280m).  Income increased 25% (£4,262m) to £21,595m (2005: £17,333m) whilst operating expenses rose 20% (£2,147m) to £12,674m (2005: £10,527m). Impairment charges rose 37% (£583m) to £2,154 (2005: £1,571m).

Earnings per share rose 32% to 71.9p (2005: 54.4p), diluted earnings per share rose 33% to 69.8p (2005: 52.6p).  Dividends per share rose 17% to 31p (2005: 26.6p).  Return on average shareholders' funds was 25% (2005: 21%).

Business performance

In **UK Banking** strong growth in income enabled us to increase our profit before tax 17% to £2,578m.  The improvement in the cost:income ratio was four percentage points in headline terms to 52% (2005: 56%).

**UK Retail Banking** delivered a 17% profit before tax increase to £1,213m. This was driven by broadly based income growth of 7%, with particularly strong performances in savings, Local Business and UK Premier and good growth in current

- 15 -

accounts.   Our mortgage market share and processing capacity also increased strongly leading to a net market share of 4% for the second half of the year.   We doubled investment across the business.   We focused on upgrading distribution capabilities, transforming the performance of the mortgage business, revitalising product offerings, and improving core operations and processes.   The additional investment substantially offset the impact of property gains, leading to broadly flat costs.   In 2007 we expect to make further significant investment, including the restructuring of the branch network and the migration of Woolwich customers.

**UK Business Banking** delivered very strong growth in profit before tax of 18% to £1,365m.   Strong growth in loans and deposits drove income growth of 11%. Profit before business disposals grew 11%.   UK Business Banking maintained its competitive position and also funded significant investment in improving its infrastructure and customer service.

At **Barclaycard** profit before tax fell 40% to £382m.   Good income growth of 8%, driven by very strong momentum in Barclaycard International, was more than offset by a further rise in impairment charges, principally in the UK lending portfolios, and by higher costs, mainly as a result of continued investment in Barclaycard US.   In the UK, high debt levels and changing attitudes to bankruptcy and debt default contributed to increased impairment charges.   As the consumer lending market in the UK changes, Barclaycard is repositioning its business to achieve sustainable, profitable growth.   Higher borrowing by UK consumers, lower disposable household incomes and a tougher regulatory environment have seen Barclaycard take a number of actions.   The business focused on tighter lending criteria and improved collections throughout 2006 and, as a consequence, believes we have passed the worst in Barclaycard UK impairment in the second half of 2006. There has also been a review of some partnership businesses and lending to higher risk customers.   An operational review is also under way, to improve efficiency and enhance Barclaycard's ability to provide the best service to customers, wherever they are in the world.

We continued to invest in Barclaycard US.   Since we bought the business in December 2004, outstandings have grown from US$1.4bn to US$4.0bn, and cards in issue have increased from 1.1 million to 4.2 million.   Income grew 73% in 2006. Barclaycard US is on track to become profitable in 2007.

**International Retail and Commercial Banking** achieved a step change in profitability to £1,270m (2005: £633m), reflecting the inclusion of Absa for a full year, the impact of corporate development activity and growth in key geographies.

**International Retail and Commercial Banking** – excluding Absa achieved a profit before tax of £572m (2005: £335m), including a gain of £247m from the disposal of our interest in FirstCaribbean International Bank.   Excluding this gain, profit before tax was £325m (2005: £335m).   Good organic growth in the businesses across continental Europe was offset by incremental investment in distribution

capacity and technology across the businesses in 2006.  We expect to double the rate of investment in infrastructure and distribution in 2007.

**International Retail and Commercial Banking** – Absa contributed £698m profit before tax in the first full year of ownership and is performing well ahead of our acquisition business case.  Absa Group Limited achieved year on year growth in profit before tax of 24% in Rand terms, reflecting very strong growth in mortgages, credit cards and commercial property finance.  The benefits of Barclays ownership are evident in 46% attributable earnings growth in both Absa Card and Absa Capital (reported in Barclays Capital), with total synergy benefits well ahead of plan.

**Barclays Capital** produced an outstanding performance with profit before tax rising 55% to £2,216m.  Income growth of 39% was driven by doing more business with new and existing clients and was broadly based across asset classes and geographies.  Growth was particularly strong in areas where we have invested in recent years, including commodities, equity products and credit derivatives.  Profit growth was accompanied by improvements in productivity: income and profits grew significantly faster than Daily Value at Risk, risk weighted assets, economic capital, regulatory capital and costs.  The ratio of compensation costs to net income improved two percentage points to 49% and the cost:net income ratio improved three percentage points to 64%.  We continued to invest for future growth, increasing headcount 3,300 including 1,300 from the acquisition of HomEq, a US mortgage servicing business.

**Barclays Global Investors** delivered excellent results, with profit before tax up 32% to £714m. Income growth of 26% was attributable to increased management fees, particularly in the iShares and active businesses.  Assets under management grew US$301bn to US$1.8trn, including net new assets of US$68bn, reflecting very strong inflows in iShares and active assets.  The cost:income ratio improved two percentage points to 57%.

**Barclays Wealth** profit before tax rose 28% to £213m.

This reflected broadly based income growth and favourable market conditions, partially offset by a significant increase in investment in people and infrastructure to build a platform for future growth.  Total client assets increased 19% to £93bn. The cost:income ratio improved three percentage points to 79%.

In **Head office functions and other operations** the loss before tax decreased £64m to £259m, reflecting the Head office relocation costs incurred in 2005.

64.     Barclays' 2006 20-F contained the following statement by PwC:

Report of Independent Registered Public Accounting Firm to the Board of Directors and Shareholders of Barclays Bank PLC

We have audited the accompanying consolidated financial statements of Barclays Bank PLC and its subsidiary undertakings on pages 274 to 285 which

- 17 -

comprise the Consolidated balance sheets as of 31st December 2006 and 31st December 2005, and the related Consolidated income statements, the Consolidated cash flow statements, and the Consolidated statements of recognised income and expense for each of the three years in the period ended 31st December 2006. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Barclays Bank PLC and its subsidiary undertakings at 31st December 2006 and 31st December 2005, and the results of their operations and their cash flows for each of the three years in the period ended 31st December 2006 in conformity with International Financial Reporting Standards (IFRSs) as adopted by the European Union.

Accounting principles in conformity with IFRSs as adopted by the European Union vary in certain significant respects from accounting principles generally accepted in the United States of America. Information relating to the nature and effect of such differences is presented in Note 60 and Note (k) to the consolidated financial statements.

PricewaterhouseCoopers LLP
Chartered Accountants and Registered Auditors

65.     On August 2, 2007, Barclays filed a Form 6-K with the SEC containing Barclays' financial results for the six months ending June 30, 2007. It reported net income of £10.9 billion, shareholder equity of £20.9 billion, and assets of £1.16 trillion.

66.     On or about August 31, 2007, Barclays Bank filed with the SEC the 2007 Registration Statement for the Securities using a "shelf" registration statement or continuous offering process. Pursuant to that process, the 2007 Registration Statement permitted Barclays Bank to sell securities in several offerings going forward after a prospectus supplement to the Registration

- 18 -

Statement was filed for each offering. The 2007 Registration Statement incorporated by reference certain SEC filings:

> The SEC allows us to "incorporate by reference" the information we file with them, which means we can disclose important information to you by referring you to those documents. The most recent information that we file with the SEC automatically updates and supersedes earlier information.

> We have filed with the SEC a registration statement on Form F-3 relating to the securities covered by this prospectus. This prospectus is a part of the registration statement and does not contain all the information in the registration statement. Whenever a reference is made in this prospectus to a contract or other document of the company, the reference is only a summary and you should refer to the exhibits that are a part of the registration statement for a copy of the contract or other document. You may review a copy of the registration statement at the SEC's public reference room in Washington, D.C., as well as through the SEC's internet site, as discussed below.

> We filed our annual report on Form 20-F for the fiscal year ended December 31, 2006 (the "2006 Form 20-F") with the SEC on March 26, 2007. We are incorporating the 2006 Form 20-F by reference into this prospectus. We are further incorporating by reference our Current Reports on Form 6-K furnished to the SEC on April 23, 2007, April 27, 2007, May 8, 2007, May 31, 2007, June 19, 2007, July 23, 2007, July 30, 2007, August 2, 2007 and August 13, 2007, in each case to the same extent as such report was designated on the cover thereof for incorporation by reference into our Registration Statements on Form F-3 (Nos. 333-126811, 333-85646 and 333-12384).

> In addition, we will incorporate by reference into this prospectus all documents that we file with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act and, to the extent, if any, we designate therein, reports on Form 6-K we furnish to the SEC after the date of this prospectus and prior to the termination of any offering contemplated in this prospectus.

67.     The 2007 Registration Statement also stated:

> The financial statements and management's assessment of the effectiveness of internal control over financial reporting (which is included in Management's Report on Internal Control over Financial Reporting) incorporated in this Prospectus by reference to the Annual Report of Barclays PLC and Barclays Bank PLC on Form 20-F for the year ended December 31, 2006 have been so incorporated in reliance on the reports of PricewaterhouseCoopers LLP, an independent registered public accounting firm, given on the authority of said firm as experts in auditing and accounting.

68.     The 2007 Registration Statement contained the following consent from PwC:

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in this Registration Statement on Form F-3 to be filed on or about August 31, 2007 of our reports dated March 8, 2007, except for the last two paragraphs in `Recent developments' on page 157, for which the date is March 26, 2007, for:

1.      Barclays PLC relating to the financial statements, management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting; and

2.      Barclays Bank PLC relating to the financial statements which appear in the combined Annual Report on Form 20-F for Barclays PLC and Barclays Bank PLC for the year ended December 31, 2006. We also consent to the reference to us under the heading "Experts" in such Registration Statement.

/s/ PricewaterhouseCoopers LLP
PricewaterhouseCoopers LLP
London, England
August 31, 2007

69.      On or about September 10, 2007, Barclays Bank filed, on Form 424B5, the prospectus supplement to the 2007 Registration Statement for the September 2007 offering (the "September 2007 Prospectus"), pursuant to which defendants sold 48 million shares of the Series 3 Securities at $25 per share for proceeds of $1.2 billion.   The September 2007 Prospectus incorporated by reference Barclays' previously filed Forms 20-F and 6-K.

70.      On or about November 30, 2007, Barclays Bank filed, on Form 424B2, the prospectus supplement to the 2007 Registration Statement for the November 2007 offering (the "November 2007 Prospectus"), pursuant to which defendants sold 40 million shares of the Series 4 Securities at $25 per share for proceeds of $1 billion.  The November 2007 Prospectus incorporated by reference Barclays' previously filed Forms 20-F and 6-K.

71.      On March 26, 2008, Barclays filed its 2007 Form 20-F Annual Report (the "2007 20-F") with the SEC.  The 2007 Form 20-F stated:

Group Performance

Barclays delivered profit before tax of £7,076m. Earnings per share were 68.9p and we increased the full year dividend payout to 34p, a rise of 10%.

Income grew 7% to £23,000m. Growth was well spread by business, with strong contributions from International Retail and Commercial Banking, Barclays Global Investors and Barclays Wealth. Net income, after impairment charges, grew 4% and included net losses of £1,635m relating to credit market turbulence, net of £658m of gains arising from the fair valuation of notes issued by Barclays Capital and settlements on overdraft fees in relation to prior years of £116m in UK Retail Banking.

Impairment charges and other credit provisions rose 30% to £2,795m. Impairment charges relating to US sub-prime mortgages and other credit market exposures were £782m. Excluding these sub-prime related charges, impairment charges improved 7% to £2,013m. In UK Retail Banking and Barclaycard, impairment charges improved significantly, as a consequence of reductions in flows into delinquency and arrears balances in UK cards and unsecured loans. UK mortgage impairment charges remained negligible, with low levels of defaults, and the wholesale and corporate sector remained stable. The significant increase in impairment charges in International Retail and Commercial Banking was driven by very strong book growth.

Operating expenses increased 4% to £13,199m. We invested in growing the branch network and distribution channels in International Retail and Commercial Banking and in infrastructure development in Barclays Global Investors. Costs were lower in UK Banking and broadly flat in Barclays Capital. Gains from property disposals were £267m (2006: £432m). The Group cost:income ratio improved two percentage points to 57%.

Business Performance – Global Retail and Commercial Banking

**In UK Banking** we improved the cost:income ratio a further two percentage points to 48%, excluding settlements on overdraft fees in relation to prior years of £116m. On this basis we have delivered a cumulative eight percentage point improvement in the past three years, well ahead of our target of six percentage points.

**UK Retail Banking** profit before tax grew 9% to £1,282m. Income grew 2% excluding settlements on overdraft fees in relation to prior years of £116m, reflecting a very strong performance in Personal Customer Retail Savings and good performances in Current Accounts, Local Business and Home Finance, partially offset by lower income from loan protection insurance. Enhancements in product offering and continued improvements in processing capacity enabled a strong performance in mortgage origination, with a share of net new lending of 8%. Operating expenses were well controlled and improved 3%. Impairment charges improved 12% reflecting lower charges in unsecured consumer lending and Local Business. This was driven by improvements in the collection process which led to

reduced flows into delinquency, lower levels of arrears and stable charge-offs. Mortgage impairment charges remained negligible.

**Barclays Commercial Bank** delivered profit before tax of £1,371m. Profit before business disposals improved 5%. Income improved 7% driven by very strong growth in fees and commissions and steady growth in net interest income. Non-interest income increased to 32% of total income reflecting continuing focus on cross sales and efficient balance sheet utilisation. Operating expenses rose 6%, reflecting increased investment in product development and support, sales force capability and operational efficiency. Impairment charges increased £38m as a result of asset growth and higher charges in Larger Business.

**Barclaycard** profit before tax increased to £540m, 18% ahead of the prior year. Steady income relative to 2006 reflected strong growth in Barclaycard International offset by a reduction in UK card extended credit balances as we re-positioned the UK business and reduced lower credit quality exposures including the sale of the Monument card portfolio. As a result, impairment charges improved 21%, reflecting more selective customer recruitment, client management and improved collections. Operating expenses increased 12%, driven by continued investment in Barclaycard International and the non-recurrence of a property gain included in the 2006 results. Barclaycard US continued to make good progress, and for the first time made a profit for the year.

**International Retail and Commercial Banking** profits declined 23% to £935m. Results in 2006 included a £247m profit on disposals and £41m post tax profit share from FirstCaribbean International Bank. 2007 results reflected a 12% decline in the average value of the Rand.

**International Retail and Commercial Banking – excluding Absa** delivered a profit before tax of £246m. Income rose 28% as we significantly increased the pace of organic growth across the business, with especially strong growth in Emerging Markets and Spain. Operating expenses grew 32% as we expanded the distribution footprint, opening 324 new branches and 157 new sales centres and also invested in rolling out a common technology platform and processes across the business. Impairment increased to £79m including very strong balance sheet growth and lower releases.

**International Retail and Commercial Banking – Absa** Sterling profit fell £9m to £689m after absorbing the 12% decline in the average value of the Rand. Retail loans and advances grew 22% and retail deposits grew 20%.

Business Performance – Investment Banking and Investment Management

**Barclays Capital** delivered a 5% increase in profit before tax to £2,335m. Net income was ahead of last year, reflecting very strong performances in most asset classes including interest rates, currencies, equity products and commodities. Results also included net losses arising from credit market turbulence of £1,635m net of

gains from the fair valuation of issued notes of £658m. All geographies outside the US enjoyed significant growth in income and profits. Strong cost control led to operating expenses declining slightly year on year.

**Barclays Global Investors** (BGI) profit before tax increased 3% to £734m. Income grew 16%, driven by very strong growth in management fees and in securities lending revenues. Profit and income growth were both affected by the 8% depreciation in the average value of the US Dollar. BGI costs increased 25% as we continued to build our infrastructure across multiple products and platforms to support future growth.

The cost:income ratio rose to 62%. Assets under management grew US$265bn to US$2.1 trillion, including net new assets of US$86bn.

**Barclays Wealth** profit before tax rose 25% to £307m. Income growth of 11% was driven by increased client funds and greater transaction volumes. Costs were well controlled as business volumes rose and the cost:income ratio improved three percentage points to 76%. We continued to invest in client facing staff and infrastructure. Redress costs declined. Total client assets increased 14% to £133bn.

Head office functions and other operations

**Head Office functions and other operations** loss before tax increased 65% to £428m reflecting higher inter-segment adjustments and lower gains from hedging activities.

Capital management

At 31st December 2007, our Basel I Tier 1 Capital ratio was 7.8% (2006: 7.7%). We started managing capital ratios under Basel II from 1st January 2008. Our Basel II Tier 1 Capital ratio was 7.6%. Our Equity Tier 1 ratio was 5.0% under Basel I (2006: 5.3%) and 5.1% under Basel II.

We have increased the proposed dividend payable to shareholders in respect of 2007 by 10%. We maintain our progressive approach to dividends, expecting dividend growth broadly to match earnings growth over time.

72.     Barclays' 2007 Form 20-F contained the following statements by PwC:

Independent Registered Public Accounting Firm's report

Report of Independent Registered Public Accounting Firm to the Board of Directors and Shareholders of Barclays PLC

In our opinion, the accompanying Consolidated income statements and the related Consolidated balance sheets, Consolidated statements of recognised income and  expense and, Consolidated statements of cash flows present fairly, in all material respects, the financial position of Barclays PLC (the "Company") and its

subsidiaries at 31st December 2007 and 31st December 2006 and the results of their operations and cash flows for each of the three years in the period ended 31st December 2007, in conformity with International Financial Reporting Standards (IFRSs) as issued by the International Accounting Standards Board. Also, in our opinion the Company maintained, in all material respects, effective internal control over financial reporting as of 31st December 2007, based on criteria established in Internal Control – Integrated Framework issued by the COSO. The Company's management are responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in "Management's report on internal control over financial reporting" in the section headed Accountability and audit. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our audits which were integrated in 2007 and 2006. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorisations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorised acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

*    *    *

PricewaterhouseCoopers LLP

Chartered Accountants and Registered Auditors
London, United Kingdom
7th March 2008

73.     On or about April 8, 2008, Barclays Bank filed, on Form 424B5, the prospectus supplement to the 2007 Registration Statement for the April 2008 offering (the "April 2008 Prospectus"), pursuant to which defendants sold 100 million shares of the Series 5 Securities at $25 per share for proceeds of $2.5 billion.   The April 2008 Prospectus incorporated by reference Barclays' 2007 Form 20-F.

74.     The Registration Statements/Prospectuses contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading and were not prepared in accordance with applicable SEC rules and regulations.

75.     The true facts which were omitted from the Registration Statements were:

(a)     Barclays' portfolio of mortgage-related securities was impaired to a much larger extent than had been disclosed;

(b)     Defendants failed to properly record losses for impaired assets;

(c)     Barclays' internal controls were inadequate to prevent the Company from improperly reporting its mortgage-related investments; and

(d)     Barclays was not as well capitalized as represented and would have to continually raise additional capital, which would dilute current holders and those investors purchasing the Securities in the Offerings.

## POST-OFFERING EVENTS

76.     On August 7, 2008, Barclays announced that its first-half net income declined 34% to £1.72 billion ($3.4 billion).   The net income reduction was due in large part to write-downs of £2.8 billion of credit-related assets, more than analysts predicted.   Analysts commented on the size of the write-downs:

- 25 -

"Maybe this is grist to the mill for those who said that Barclays was under providing for its writedowns," said Simon Maughan, a London-based analyst at MF Global Securities Ltd. who has "buy" rating on the stock. "They have written off significantly more than they flagged in June . . . ."

77.     Notwithstanding these huge write-downs, the price of the Securities did not decline appreciably due to Barclays' assurances that it did not require additional capital.

78.     On October 13, 2008, Barclays issued a press release entitled "Update on capital, dividend and current trading," which stated in part:

Following the announcement made by the UK Government on 8 October 2008 in relation to UK banking sector capital and funding, Barclays has been in detailed discussions with the UK Financial Services Authority ("FSA") and HM Treasury.

**Capital and dividend**

***Barclays is well capitalised***, profitable and has access to the liquidity required to support its business. Taking into account the new higher capital targets which the FSA has set for all UK banks, the Board has determined that it will raise in excess of £6.5bn of Tier 1 Capital. This would result in a pro forma Tier 1 Capital ratio as at 30 June 2008 of over 11%.

Given the strength of Barclays well diversified business and the existing capital base, the Board expects that the additional capital will be raised from investors without calling on the Government funding which has been offered to UK Banks. Accordingly, a plan has been agreed with and approved by the FSA which envisages:

- The issue of preference shares to raise c£3bn by 31 December 2008 as Barclays contribution to the commitment made by UK banks to increase Tier 1 capital by £25 billion in aggregate by year-end.

- The issue of new ordinary shares to raise £0.6bn ($1bn) as announced on 17 September as part of our announcement concerning the acquisition of Lehman Brothers North American investment banking and capital markets businesses ('the Lehman Acquisition').

- The issue of new ordinary shares to raise a further c£3bn as soon as practicable after the announcement of our full year 2008 results and our intention is that this should be before 31 March 2009. The offer of such shares will be structured so as to give existing shareholders full rights of participation.

- Balance sheet management and operational efficiencies to release at least a further £1.5bn in equity resources.

As part of the above issuance of shares, Barclays has agreement in principle with an existing shareholder to contribute £1bn in new capital, to be allocated between the component parts listed above.

In the light of the new capital ratios agreed with the FSA and in recognition of the need to maximise capital resources in the current economic climate, the Board of Barclays has concluded that it would not be appropriate to recommend the payment of a final dividend for 2008. This dividend, amounting to c£2bn, would otherwise have been payable in April 2009. Our intention is to resume dividend payments in the second half of 2009.

The effect of the above is that more than £6.5bn is raised through capital issuance and at least a further £3.5bn through dividend and other actions.

In the event that any of the proposed capital issuances do not proceed, Barclays, along with the other UK banks, would be eligible to have access to the capital facilities announced by the UK Government on 8 October 2008. The terms of such facilities would be negotiated at the time and may be on terms less favourable than those made available today. The UK Government has also confirmed that Barclays is eligible to use the extended facilities with the Bank of England and the UK Government guarantee of term unsecured issuance which have been made available to UK Banks.

**Current trading**

We will provide our usual Interim Management Statement on 18 November 2008. When we announced the Lehman Acquisition on 17 September 2008, we commented that Barclays had traded satisfactorily during the months of July and August. In the month of September, profit before tax very significantly exceeded the monthly run rate for the first half of the year, with strong contributions from Global Retail and Commercial Banking and from Investment Banking and Investment Management, and strong inflows of new customers and customer deposits.

79.     In mid-November 2008, Barclays acknowledged it needed to raise capital. It quickly became apparent that Barclays might not be able to persuade investors to approve a £7 billion ($10.48 billion) plan to raise cash by the November 24 deadline.

80.     On this news, the price of the Securities declined sharply. Investors' fears were confirmed on November 25, 2008, when *TimesOnline* issued an article entitled "Investor fury over high cost of Barclays' deal," which stated in part:

- 27 -

He was clearly furious. Claiming that he had been denied the opportunity to speak, he stormed to the front of the conference hall, intent on telling the City heavyweights in his sights what he thought of them, only to be restrained by a posse of security staff. For this investor, certainly, Barclays' decision to turn to the Middle East for funds was a step too far.

That Barclays got its money yesterday will be a relief to the bank. Private and institutional investors voted to accept its contentious scheme to raise £5.8 billion from the Middle East.

But the meeting at the ExCel conference centre in East London was also a stark illustration that the price, at least in terms of management pride, for that cash has been high. Investors lined up to berate the bank and its executives and such was the bad feeling that Marcus Agius, the Barclays chairman, was forced to end questioning. Both he and John Varley, the chief executive, faced calls to resign.

Many in the audience, about 500-strong, complained about being shut out of a capital plan that gives the Middle Eastern investors almost a third of Barclays' shares.

The bank has ignored the long-established right of first refusal for its existing investors, who now face dilution. Instead, Barclays choose to raise more than £7 billion, of which £5.8 billion was through a combination of securities issued to Qatar Holdings and Sheikh Mansour Bin Zayed al-Nahyan, a member of the Abu Dhabi Royal Family. The remaining £1.5 billion was raised through a placement to institutional shareholders and was not part of yesterday's vote.

Retail investors were shut out entirely. The bank won enough support to press ahead with its fundraising, but the refusal by 22 per cent of the bank's shareholders to back it was a significant blow. A total of 584,125,704 votes were cast against the bank's resolution to increase its share capital, while a further 528,965,914 votes were withheld as investors, particularly institutions, abstained.

Investor anger had already led Barclays to waive bonuses for four of its directors this year and put its entire board up for reelection next April. Yet the meeting heard demands for salary caps for directors, the end of executive share options and demands to resume dividend payments. When the harshest critics made their points, they did so to regular applause.

"Shame on you," Eric Chalker, who owned 1,800 Barclays shares, said.

Trevor White, who has been a Barclays shareholder since 1962, said that he had lost £200,000 on his investment within the past 12 months.

He said that he had written to both Mr Varley and Mr Agius demanding their resignations.

Institutions, too, made their voices heard, among them F&C Asset Management. George Dallas, the director of corporate governance at F&C, which owns 57 million shares, said: "We think that this amounts to a clear and egregious abuse of preemption rights. We object that the consequences of voting against this particular transaction would make a bad situation worse."

Mr Agius expressed Barclays' "deep regret" over the fundraising, but he did not apologise for the bank's position, as his counterparts at Royal Bank of Scotland had last week. He said that taking the "Devil's route" and shutting out the bank's long-term owners had put Barclays in an "exquisitely awkward position".

He acknowledged the anger felt by investors, but said that the bank's entire future could have been put at risk if it had pressed too hard for preemption rights to be respected. "A dangerous leak that we were struggling to find money on the right terms could have been terminal," he said.

Afterwards, Derek Norcup, who has 7,000 Barclays shares, said that he had arrived with an open mind but had decided to vote against. The cancelling of the dividend, particularly when Mr Varley had hailed the bank's profitability, was the final straw, he said.

81.     In mid-January 2009, Barclays announced plans to cut up to 2,100 jobs in its retail and commercial banking units.  Analysts were surprised by this development:

"We think this is a significant development, as previously Barclays had been arguing that this downturn was a great time to invest in people," said analysts at Evolution Securities.

"Management have consistently been too upbeat with their outlook statements; we are going into the worst downturn in living memory and it is hard to see how Barclays, with a 1.4 trillion pound balance sheet, is not going to have to recognize larger write-downs," they added.

82.     On this news, the price of the Securities collapsed.

## COUNT I

### Violations of §11 of the 1933 Act
### Against All Defendants

83.     Plaintiff repeats and realleges each and every allegation contained above.

84.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless

- 29 -

misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

85.     The Registration Statements were false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

86.     Barclays Bank was the registrant for the Offerings.  As issuer of the Securities, Barclays Bank is strictly liable to plaintiff and the Class for the misstatements and omissions.

87.     The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statements.  Each of the Individual Defendants signed or authorized the signing of the Registration Statements.

88.     The Underwriter Defendants named herein were responsible for the contents and dissemination of the Registration Statements.

89.     PwC acted as Barclays Bank's auditor and was named by consent as having certified a part of the Registration Statements.

90.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

91.     The Registration Statements were false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

92.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

93.     Plaintiff acquired the Securities pursuant and/or traceable to the Registration Statements.

94.     Plaintiff and the Class have sustained damages.  At the time of their purchases of the Securities, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT II

### Violations of §12(a)(2) of the 1933 Act
### Against Defendants Barclays Bank and Barclays

95.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

96.     For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

97.     By means of the defective April 2006 Prospectus, September 2007 Prospectus, November 2007 Prospectus and April 2008 Prospectus (the "Prospectuses"), the defendants named herein assisted in the sale of the Securities to plaintiff and other members of the Class.

98.     The Prospectuses contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  The defendants named in this Count owed plaintiff and the other members of the Class who purchased the Securities pursuant to the Prospectuses the duty to make a reasonable and diligent investigation of the statements contained in

the Prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectuses as set forth above.

99.     Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectuses at the time plaintiff acquired the Securities.

100.    By reason of the conduct alleged herein, these defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased the Securities pursuant to the Prospectuses sustained substantial damages in connection with their purchases of the Securities. Accordingly, plaintiff and the other members of the Class who hold such Securities have the right to rescind and recover the consideration paid for their Securities, and hereby tender their Securities to the defendants sued herein. Class members who have sold their Securities seek damages to the extent permitted by law.

**COUNT III**

**Violations of §15 of the 1933 Act**
**Against the Individual Defendants**

101.    Plaintiff repeats and realleges each and every allegation contained above.

102.    This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

103.    Each of the Individual Defendants was a control person of Barclays Bank and Barclays by virtue of his or her position as a director, senior officer and/or major shareholders of

Barclays Bank and Barclays which allowed each of these defendants to exercise control over Barclays Bank, Barclays and their operations.

104.    Each of the Individual Defendants was a culpable participant in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statements and having otherwise participated in the process which allowed the Offerings to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiff as a Class representative;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: April 20, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

_____
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
MATTHEW P. MONTGOMERY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

ALFRED FAIT ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Acquisitions: | Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|---|
| | 4/8/08 | 600 shares of 8.125% Dollar-Denominated Non-Cumulative Callable Preference, Series 5 | $25.00 |

5.      Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Fait v. Regions Financial Corporation, et al.*, No. 09-CV-03161-RMB (S.D.N.Y.)

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

BARCLAYS SERIES 5

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of April, 2009.

_____
ALFRED FAIT

BARCLAYS SERIES 5